|  |  |
|---|---|
|  | UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF FLORIDA<br><br>CASE NO. 07-21728-Civ-GOLD<br>MAGISTRATE P. A. WHITE |
| ERLIS JEAN-BAPTISTE,    : |  |
|     Plaintiff,    : |  |
| v.    : | <u>REPORT OF</u><br><u>MAGISTRATE JUDGE</u> |
| JOSE GUTIERREZ,    : |  |
|     Defendant.    : |  |

### I. Introduction

In this *pro se* civil rights action, the plaintiff Erlis Jean-Baptiste, a/k/a Erlis Baptiste-Jean, a/k/a Alex Jean Baptiste, has filed a complaint for damages pursuant to 42 U.S.C. §1983, alleging that on July 23, 2003, the defendant, Miami-Dade Police Officer Jose Rodriguez, used excessive force against him, by shooting him during the course of his arrest. The arrest resulted in plaintiff's conviction on various charges in Miami-Dade criminal case No. F03-020927B, which stemmed from his involvement in an armed home-invasion at the residence of Malcom Duff on the morning of July 23, 2003, shortly before he was apprehended by Officer Rodriguez.[1]

**This Cause is before the Court upon defendant Rodriguez's motion for summary judgment (DE#37)** with multiple exhibits [DE#s 37-3 to 37-23], as to which the plaintiff was advised of his right to respond (<u>see</u> Order of Instructions, DE#38).[2] The plaintiff filed

---

[1] The record indicates that the plaintiff is known by numerous aliases, including Alex Jean Baptiste, and Erlis Baptiste-Jean. <u>See</u> DE#37-4, p.1, Sentence imposed by the Eleventh Judicial Circuit of Florida, in Case No. F03-020927B. This is noted because in various documents of record in this §1983 action, the plaintiff is referred to by different names. For example, in a sworn statement (DE#37-5), given at Miami-Dade Police Headquarters by Sidney Jean [who also was a suspect in the 2/24/03 home invasion], the plaintiff is referred to by the names Alex and Alex Jean, while in other documents he is referred to as Erlis and Erlis Baptiste-Jean.

[2] Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is proper

> [i]f the pleadings, depositions, answers to interroga-
> tories, and admissions on file, together with the
> affidavits, if any, show that there is no genuine issue

a Response (DE#49, pp.1-28, and 31) with multiple exhibits [at DE#s 49, pp.29-30 and 32; DE# 49, pp.33-80; and DE#49-2, pp.1-114].

---

> as to any material fact, and that the moving party is entitled to judgment as a matter of law.

In <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986), the Court held that summary judgment should be entered only against

> a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. (citations omitted)

Thus, in <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986), the Court held that summary judgment should be entered only against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. (citations omitted). Thus, pursuant to <u>Celotex</u> and its progeny, a movant for summary judgment bears the initial responsibility of informing the court of the basis for his motion by identifying those parts of the record that demonstrate the nonexistence of a genuine issue of material fact. This demonstration need not be accompanied by affidavits. <u>Hoffman v. Allied Corp.</u>, 912 F.2d 1379, 1382 (11 Cir.1990).If the party seeking summary judgment meets the initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party, to come forward with sufficient evidence to rebut this showing with affidavits or other relevant and admissible evidence. <u>Avirgan v. Hull</u>, 932 F.2d 1572, 1577 (11 Cir.), <u>cert. denied</u>, 112 S.Ct. 913 (1992). It is the nonmoving party's burden to come forward with evidence on each essential element of his claim sufficient to sustain a jury verdict. <u>Earley v. Champion International Corp.</u>, 907 F.2d 1077, 1080 (11 Cir.1990). The non-moving party cannot rely solely on his complaint and other initial pleadings to contest a motion for summary judgment supported by evidentiary material, but must respond with affidavits, depositions, or otherwise to show that there are material issues of fact which require a trial <u>Fed.R.Civ.P.</u> 56(e); <u>Coleman v. Smith</u>, 828 F.2d 714, 717 (11 Cir.1987). If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment may be granted. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986); <u>Baldwin County, Alabama v. Purcell Corp.</u>, 971 F.2d 1558 (11 Cir.1992). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." <u>Walker v. Darby</u>, 911 F.2d 1573, 1577 (11 Cir. 1990) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, <u>supra</u>).

Pursuant to <u>Brown v. Shinbaum</u>, 828 F.2d 707 (11 Cir.1987), an Order (DE#38) was entered to inform the *pro se* plaintiff of his right to respond to the defendant's motion for summary judgment, and to instruct him regarding requirements under <u>Fed.R.Civ.P.</u> 56 for a proper response to such a motion.

Thereafter, defendant Rodriguez filed a Reply (DE#63, pp.1-15) with additional exhibits (DE#63-2).

## II. Law Relating to Use of Force, and Qualified Immunity

A claim that a law enforcement officer used excessive force in the course of an arrest, an investigatory stop, or any other seizure of a free citizen is to be analyzed under the Fourth Amendment and its "reasonableness" standard. Graham v. Connor, 490 U.S. 386 (1989); Vinyard v. Wilson, 311 F.3d 1340, 1346-47 (11 Cir. 2002); Lee v. Ferraro, 284 F.3d 1188, 1197 (11 Cir. 2002); Ortega v. Schram, 922 F.2d 684, 694 (11 Cir. 1991). "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham, 490 U.S. at 396. However, "[t]he use of excessive force in carrying out an arrest constitutes a violation of the Fourth Amendment." Rodriguez v. Farrell, 280 F.3d 1341, 1351 (11 Cir. 2002). To establish such a Fourth Amendment violation, Plaintiff must show (1) that a seizure occurred and (2) that the force the defendants used to carry out that seizure was unreasonable. Harris v. Coweta County, 433 F.3d 807, 812-13 (11 Cir. 2005).

The reasonableness inquiry is made from the perspective of a reasonable officer on the scene. The question is whether the defendants' conduct was objectively reasonable, in light of all the facts and circumstances confronting them without regard to their subjective intent or motivation. Such an analysis requires a court to balance "the nature and quality of the intrusion on the individual's fourth amendment interests against the importance of the government interest alleged to justify the intrusion." Graham, supra, quoting United States v. Place, 462 U.S. 696 (1983). The factors a Court considers when balancing the necessity for an application of force against an arrestee's constitutional rights include: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight; Graham, supra, 490 U.S. at 396; Vinyard, supra, 311 F.3d at 1347; Lee, supra, 284 F.3d at

1197; Ortega, supra, 922 F.2d at 695.  In determining whether force applied was "reasonable" under the circumstances (i.e., proportional to the need for its use), the Court must examine: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; and (3) the extent of the injury inflicted upon the individual to whom the force was applied. Vinyard, at 1347; Lee at 1998.

The intentional seizure of a person "readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful." California v. Hodari D., 499 U.S. 621, 626 (1991).  Although it may not always be clear when minimal police interference becomes a seizure, "there can be no question that the apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." Tennessee v. Garner, 471 U.S. 1, 7 (1985). The Supreme Court and the Eleventh Circuit have recognized that it is constitutionally permissible for an officer to use deadly force when the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others. Garner, supra, 471 U.S. at 11; Carr v. Tatangelo, 338 F.3d 1259, 1268 (11 Cir. 2003); Willingham v. Loughnan, 261 F.3d 1178, 1186 (11 Cir. 2001).

The Eleventh Circuit, in Carr, supra, 338 F.3d at 1269, (quoting McLenagan v. Karnes, 27 F.3d 1002 (4 Cir. 1994)), has held that "a reasonable but mistaken belief that probable cause exists for using deadly force is not actionable under §1983."[3]

---

[3] In reaching that conclusion, the Eleventh Circuit cited McLenagan v. Karnes, 27 F.3d 1002 (4 Cir. 1994) for it's holdings that "a police officer's use of deadly force is not excessive where he has probable cause to believe a suspect poses a threat of serious physical harm to the officers or others," and that "[r]egardless of whether probable cause actually existed, if a reasonable officer possessing the same particularized information as [the subject officer] *could* have, in light of *Garner*, believed that his conduct was lawful, then [the officer] is entitled to qualified immunity." (Carr, supra, 338 F.3d at 1269)(quoting McLenagan, supra, 27 F.3d at 1006-1007). The Eleventh Circuit in Carr, further noted that the McLenagan Court, in reaching its holdings, determined that in certain situations a warning before use of deadly force is unnecessary, e.g., when it is not feasible, because pausing to give a warning

Thus, use of potentially deadly force is reasonable: when an officer "(1) 'has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others' or 'that he has committed a crime involving the infliction or threatened infliction of serious physical harm;' (2) reasonably believes that the use of deadly force was necessary to prevent escape; and (3) has given some warning about the possible use of deadly force, if feasible." Robinson v. Arruqueta, 415 F.3d 1252, 1255 (11 Cir. 2005) (quoting Garner, supra, 471 U.S. at 11).

In this matter, the defendant Gutierrez argues that he is entitled to qualified immunity.

The defense of qualified immunity insulates governmental officials from personal liability for actions taken pursuant to their discretionary authority. See Saucier v. Katz, 533 U.S. 194 (2001); Harlow v. Fitzgerald, 457 U.S. 800 (1982); Flores v. Satz, 137 F.3d 1275 (11 Cir. 1998); Foy v. Holston, 94 F.3d 1528 (11 Cir. 1996). If the force applied was reasonable under the circumstances and not excessive, the defendant police officer has not violated any clearly established constitutional right, and is entitled to summary judgment based upon qualified immunity. Moore v. Gwinnett County, 967 F.2d 1495, 1498 (11 Cir. 1992), quoting, Leslie v. Ingram, 786 F.2d 1533, 1536 (11 Cir. 1986).

### III.  Discussion

In this case, there is no dispute that, at the time of the

---

could possibly cost the officer his life. See Carr, supra, at 1269, n.19 (quoting McLenagan, supra, 27 F.3d at 1007-1008)("For all [the officer] knew, the hesitation involved in giving a warning could readily cause such a warning to be his last. We decline, therefore, to fashion an inflexible rule that, in order to avoid civil liability, an officer must always warn his suspect before firing – particularly where, as here, such a warning might easily have cost the officer his life"... "It is true that [the officer] did not see a gun in [the suspect's] hands, but it is also true that he could not confirm that [the suspect] was unarmed.  We will not second-guess the split-second judgment of a trained police officer merely because that judgment turns out to be mistaken, particularly where inaction could have resulted in death or serious injury to the officer and others. Although it is extremely unfortunate that [the suspect] was seriously injured, §1983 does not purport to redress injuries resulting from reasonable mistakes").

5

events alleged, the defendant police officer Gutierrez was acting within the scope of his discretionary authority. Thus, the question, when drawing inferences in favor of the non-movant/plaintiff, is whether Gutierrez's actions violated clearly established law.

Defendant Gutierrez has submitted evidence (see Index of Exhibits, at DE#37-2) which includes, *inter alia*, records showing Jean-Baptiste's convictions for offenses committed on July 24, 2003; testimony by plaintiff's co-defendant, Sidney Jean; testimony by Officer Jose Gutierrez who shot Jean-Baptiste; testimony by two Miami-Dade Officers (Eleshia Lewis, and Reginald Cross) who had a surprise encounter with Sidney Jean and Erlis Jean-Baptiste on the street, after the home-invasion and before Jean-Baptiste was shot. The record also contains various police reports relating to the home invasion which occurred prior to Jean-Baptiste's arrest, and relating to Jean-Baptiste's shooting upon arrest.

Plaintiff Jean-Baptiste has submitted Court records reflecting the offenses with which he was charged, reflecting those charges that were dropped, and reflecting those for which he was acquitted when tried to a jury in Dade Circuit Court. (See Information, DE#49, at pp. 33 to 42; Jury Instructions, Id., pp. 43-72; and the Jury Verdict in Case F03-20927B, Id., at pp.73-75). He was charged by Information on Eight Counts: Burglary with Assault or Battery While Armed [Count 1]; Kidnapping with a Weapon [Count 2]; Aggravated Battery with a Deadly Weapon [Count 3]; Robbery using a Deadly Weapon or Firearm [Count 4]; Armed Robbery/CarJacking [Count 5]; Unlawful Possession of a Firearm by a Convicted Felon [Count 6]; Unlawful Possession of a Firearm by a Violent Career Criminal [Count 7]; and Aggravated Assault on a Police Officer [Count 8]. (See DE#49, pp.33-42). Counts 1-4 relate to events that occurred inside the Duff residence. (DE#49, pp.34-37). Count 5 relates to the taking of Duff's vehicle [the red Dodge Neon] (Id. p.38). By the time the case reached the jury, the firearm possession charges [Counts 6 and 7, charged at DE#49, pp. 39-40] were dropped, and the counts were re-numbered so that Count 8 of the Information [Aggravated Assault upon a Police Officer] became Count 6 for

6

purposes of trial and the rendering of verdicts by the jury. (See and compare Information, DE#49 at pp.33-42, with Jury Verdict Form, DE#49, pp.73-75). Count 8 [Count 6 at trial] charged that Erlis Baptise-Jean allegedly committed aggravated assault upon "Jose Gutierrez, a Law Enforcement Officer engaged in the lawful performance of his duty, by intentionally threatening by word or act to do violence to said victim, coupled by the apparent ability to do so, by POINTING A FIREARM AT OFFICER GUTIERREZ, which created a well-founded fear in said victim that such violence was imminent, with a deadly weapon,  to wit: A FIREARM..." (DE#49, p.41).

The record shows that defendant Baptiste-Jean [plaintiff Jean-Baptiste in this §1983 action] was convicted at trial on Counts 1-5, and that on Count 6 [based on allegedly pointing his gun at Officer Gutierrez, thereby putting him in fear for his life] he was found not guilty of aggravated assault on a police officer, and was not found guilty of the possible lesser included offenses [aggravated assault, assault on a LEO, simple assault]. (DE#49, p.75).

A Florida DOC record pertaining to Jean-Baptiste, dated June 11, 2008 (DE#37-3), which was submitted by the defendant, indicates that on that date, some five years after the events alleged, Jean-Baptiste, a Black male, 6'1" tall, weighing 195 lbs, was incarcerated at Dade C.I., serving a 15 year sentence on the Aggravated Battery conviction, and Life sentences on the convictions for armed burglary, kidnapping, armed robbery, and armed carjacking. A copy of the state Circuit Court's Conviction and Sentence [which was deferred on 5/2/06, was entered on 8/3/06, and filed on 9/12/06] appears in the record at DE#37-4.

The testimony of Officers Lewis and Cross indicates that they were working as partners on the morning of July 24, 2003, serving eviction papers in the neighborhood near the house where plaintiff Jean-Baptiste was shot and arrested.

Lewis described two suspects, who jumped over a fence, and found themselves in front of her and Cross. The first was 5'6" to

5'7," and had short dread locks, called "de la sols;" and the second man was somewhat heavy set, and "the same size or a little bit taller" that the first.  The thin man with the de la sols had something which appeared to be silver in his hand; and the heavy set one "had something in his hand, which was black, and appeared to be a gun."  Lewis testified that she and Cross "drew down" their weapons and ordered the men several times to "drop the gun." They did not comply, and instead fled South, and jumped back over the fence. Lewis lost sight of the fleeing men and her partner Cross. She heard 5-6 shots. She set up a perimeter, and then went into a back yard, where she saw her partner (Cross) by a shed, and after walking further into the yard, almost to the rear of the shed, she was able to see another officer and a subject on the ground.  Lewis then went back to her duties of serving eviction papers, and at an apartment complex saw officers detaining a second subject, who was leaning on the trunk of a police car, and whom she identified as the "skinny guy" she and Cross had seen earlier with something silver in his hand. (DE#37-11, Sworn Statement by Lewis).

Officer Cross testified that when he and Lewis were serving evictions, he saw two subjects, both Black males, jump over the fence. According to Cross, the larger of the men (described by him as being 5'10" to 5'11," and 230-240 lbs) had gun in his hand. When asked if he could tell what kind of gun it was, Cross said that it was "a black gun, semiautomatic." Cross was unable to say that the other man (whom he described as being of slighter build -- "thin" and perhaps 5'11") was armed. Cross testified that he "drew down" on the armed individual, and asked him several times to drop his gun. Cross testified that "he refused to drop his gun. Then, he turned and jumped back over the fence and fled southbound through the parking lot." Cross testified that a short time later he heard 5-6 gunshots, that he "ran behind the house" and saw "the subject" was "laying on the ground, face down," and Officer Gutierrez "was standing over the subject, advising over the radio." (DE#37-12, Sworn Statement by Cross, at pp.3-6).

Among the defendant's exhibits are a Sworn Statement(DE#37-5)

and a Deposition (DE#37-6) given by Sidney Jean, who with plaintiff Jean-Baptiste, was involved in the 7/23/03 home invasion, and the encounter with Officers Lewis and Cross. In his sworn statement, Sidney Jean testified that both he and his accomplice (whom he called "Alex" in his statement to police -- see footnote 1, supra) were armed. He [Sidney Jean] had a little, black .22 automatic; and Alex had a black .38 or .45 automatic that was bigger than his .22. Sidney Jean describes the home invasion, the loading of stolen items into the victim's red four door vehicle, and their escape, with him [Sidney Jean] driving. He testified that after making a right turn and crashing into a median with metal in the middle, they bailed out. They jumped a fence, and encountered officers. Sidney Jean later heard 4 or 5 shots of gunfire. (DE#37-5).

From the record in these summary judgment proceedings it appears that the only witnesses to the actual shooting of the plaintiff Erlis Jean-Baptiste [a/k/a Alex], were the plaintiff himself, Officer Gutierrez who shot him, and an eyewitness named Ernesto Perez, an air-conditioning technician who testified at plaintiff's trial (see Transcript T/382-390, at DE#49-2 pp.64-72).[4] Perez testified that on 7/24/03 he was working on the roof of a 5 story building, and heard police sirens. When he heard a crash, he looked down, and saw that a red car had hit a wall in the middle of an intersection. The car doors were open, and two men were running. They wore black pants and shirts. Near a house, which was about 100 feet from Perez's rooftop location, the two men stopped, appeared to talk, and then one took off while the other "stayed around the house." At that property there were a shed and a tree. From his perspective, Perez could see a police officer arrive and run around the back of the house. Perez lost sight of the officer because of the tree, but he could see the man who had fled from the car. He was facing toward Perez, standing behind the shed. On direct

---

[4] Jean-Baptiste states in his Amended Pretrial Statement (DE#40) that "Ernesto Perez and Christopher Diaz will testify that they witnessed the incident from a limited vantage point." Statements by neither of those individuals is among exhibits listed by the defendant (see DE#37-2, p.1); and only testimony by Perez is listed and offered among plaintiff's Exhibits (see DE#49 at p.29).

9

examination, Perez testified that he the "heard the shot fired and the guy fall." Perez testified that, from his vantage point, he could not see the shooter firing his weapon. He testified that: "[he] fell to the ground. The officer came and both -- another officer came right after, and then they turned around and put handcuffs on him." On cross-examination, Perez testified that because he was too far away, he couldn't see the faces of the people who got out of the car or see anything in the hand of the person who was shot, or in the hand of the other man; that upon being shot the man fell to the ground; and that when the second officer arrived in the yard the shooting had already taken place.

It appears from the record that what was known by the defendant Officer Gutierrez, at the time when he encountered plaintiff Jean-Baptiste near the shed, is as follows. As he testified to in a sworn police statement, taken on 7/25/03, the day after the 7/24 incident in question (DE#37-9), Gutierrez had heard a police radio communication (a BOLO) concerning an armed home invasion robbery that had just occurred, involving 2 Black males, who were armed, and in a red "Plymouth Dodge Neon." Gutierrez proceeded toward the area, and observed a red Dodge Neon going westbound on 108 Street. Gutierrez pursued it, keeping the dispatcher apprised of his activity. After being delayed at an intersection, Gutierrez caught up to the Neon, and saw it was crashed into a wall. Gutierrez drew his weapon, saw no one was inside the car, and advised the dispatcher that he had "a bailout." Gutierrez searched on foot; a civilian on a balcony yelled and pointed toward the street; and Gutierrez saw two Black males wearing black shirts and pants, with gloves, one holding an unknown object. Due to the nature of the BOLO (an armed home invasion), Gutierrez "more or less figured that it [the unknown object] was a gun." The two men ran, and made a turn on the East side of a house. Gutierrez followed, running with his microphone in his left hand, and his gun in his right hand. He saw one of the men jump a fence, and run Northbound. Gutierrez advised the dispatcher. He could not see the other man. As Gutierrez was approaching the fence, there was a structure [a shed] to his left, and when he got to the corner of

10

it, he saw the second Black male. Gutierrez testified, "When I turned my face, the north side, I saw the second black male holding a gun pointed directly at me." (DE#37-9, p.9).

When asked what he thought at that point, Gutierrez testified, "I was in fear for my life. I thought he was going to shoot me, so I immediately started shooting." (Id.). He testified that "I fired until the threat was gone, until I had completely emptied my magazine." (Id.). Gutierrez also testified that after he ceased firing, he saw the suspect fall to the ground. (Id.). When asked where he went after the suspect fell to the ground, Gutierrez testified, "I saw that he was in one place and the firearm was to the side of him. So I immediately went to the west side of the shed where I dropped my magazine and reloaded and secured to make sure there was nobody on that side." (Id.).

At deposition, taken nearly three years later, on April 20, 2006 (DE#37-10) Gutierrez testified: "when I cleared the shed... that's where I saw the defendant standing there with his gun pointed at me." (DE#37-10, p.28). When further questioned about whether he had seen the gun before, Gutierrez stated "Like I said at that time it was a blunt object in the hand. And due to the nature of the call, instinct already told me it was a gun due to the fact that they dispatched the home invasion robbery as two subjects with guns, driving a red Dodge Neon, which all came together." (Id. at p.29). Gutierrez testified that the suspect had the gun pointed directly at him (Id., p.30), and stated his opinion that "the defendant was basically trying to ambush me." (Id., pp.30). When asked if he told the man to drop the gun (Id.), Gutierrez testified "Absolutely not. At that point in time there's a firearm pointed at me. If I would have told him to drop the gun, I would be dead right now. We wouldn't be having this conversation." (Id., at p.31). When asked if the man shot at him, Gutierrez testified, "I don't know if he ever got a chance...". (Id.). When questioned about how many times he fired, Gutierrez testified that "I cleared my entire magazine, which was 14 rounds;" and that he shot them off "one right after the other." (Id.).

Gutierrez testified that it was only after the very last round that "the subject finally went down." (Id., at p.32). When asked what happened then, Gutierrez testified, "After that I approach, I see the subject, I see the firearm, it's laying next to him. My instinct was to make sure there's no threat on the other side. I went ahead and dropped my magazine and reloaded my firearm." (Id.). Then, after reloading, Gutierrez got on the air and advised, "shots fired, shots fired, rescue." (Id.). Thereafter, Officer Mzeghet arrived on the scene. (Id., at p.33).

The plaintiff, Erlis Jean-Baptiste, in his sworn affidavit (Ex.A, scanned at DE#49, pp. 30 and 32), states that "I at no time pointed a firearm of any sort at defendant, Jose Gutierrez, or otherwise threatened Jose Gutierrez by word or act on said July 24, 2003...". (Id., at p.30). He further states that on that date he "was standing next to a shed type structure" when defendant Gutierrez "rounded the corner" and "encountered me standing by the shed." (Id.). Jean-Baptiste swears that Gutierrez, "without saying a single word to me...opened fire on me with a high caliber firearm," and did so without any warning, by word or act, that he would shoot, and without "any instruction whatsoever, that I might have been able to respond to in order to avoid being shot by Jose Gutierrez." (Id.). Jean-Baptiste states his opinion that the shooting was "without warning, provocation, or cause." (Id.).

Regarding his injuries, the discharge of the officer's weapon, and Gutierrez's actions after encountering him, the plaintiff swears in his Affidavit, as follows. "I was struck in the groin or testicle area by Jose Gutierrez's first or second shot, which brought me to the ground, *immediately*." (Id.). Plaintiff also swears that "after I fell to the ground from Jose Gutierrez's first or second shot, Jose Gutierrez did not stop shooting me," and further swears that "[t]o the contrary, from approximately eight to ten feet away form [sic] where I lay on the ground, Jose Gutierrez stood over me and continued to shoot me until there were no bullets left in his gun, and even then he did not stop pulling the trigger on his gun, but continued to pull the trigger at least two

12

additional times even though his gun was out of bullets." (<u>Id.</u>, at pp.30, 32). Jean-Baptiste, while not explicitly stating that he was not in possession of a weapon, states in his affidavit that "I did not possess a <u>cocked</u>, firearm at any time. If a firearm was found <u>cocked</u> then it was cocked by someone other than me." (<u>Id.</u>, p.32).

The Police Investigation and Crime Scene and Laboratory Reports, and related documents (DE#s 37-14 through 37-23), including a Police crime scene drawing and photographs, indicate the following. Two guns were found on the ground. One, a blue steel Beretta .25 caliber semi-automatic pistol, was found in the grass in the front yard located at 617 N.E. 137 Street. The hammer was down, the safety was off, the chamber was empty, and 7 cartridges were in the magazine. At the main scene, at the rear of the property located at 625 N.E. 137 Street, in the grass just to the east of a pile of the shooting victim's [Jean-Baptiste's] clothing that had been cut off of him by Fire-Rescue Paramedics, investigators found a KBI 9mm Semi-automatic pistol, with the hammer half cocked, the safety off, the chamber empty, and 12 cartridges in the magazine. The clothing included a ski mask, a pair of black gloves, a pair of black and white Nike sneakers with a suspect projectile in the heel, an ankle sock, boxer shorts, a black T-shirt, a white T-shirt, and Docker pants (size 38 x 34). A single gunshot hole was observed in the top of the ankle sock, with a corresponding exit hole in the heel, which police said apparently related to the projectile found in the heel of the right sneaker. There were numerous holes in the pants, 2 on the front above the left knee, 1 on the right abdomen below the waistline, 1 on the right buttock to the right of the center seam, and a tear by the waistline, above the right rear pocket. The pants had a black cloth clip-on holster inside the waistband. There were twelve spent 9 mm casings in the grass from Gutierrez's weapon; and a 9 mm magazine from Gutierrez's weapon was found on the ground, by the shed, around the corner from where his spent cartridges lay. One projectile, discovered with a metal detector, was found in the ground behind the shed South of the pants, one projectile was found lodged in Jean-Baptiste's shoe, and a what appeared to be a bullet fragment with a small piece of

bone was found on the ski mask. A police Report by Detective Sara Times indicates that at the Jackson Memorial Hospital Ryder Trauma Center, she was briefed by Dr. McKinney. According to Times' report, the doctor told her that Jean-Baptiste had multiple gun shot wounds ("GSWs"), consisting of approximately 6 GSWs to the lower extremities of the right and left legs, a GSW to the foot, and what appeared to be a GSW to the testicles.

While the Undersigned is aware of the distorting effects of hindsight,[5] and that a Court must consider the reasonableness of defendants' alleged actions from their point of view, it is generally required to accept the plaintiff's version of the underlying facts. Troupe v. Sarasota County, Fla., 419 F.3d 1160, 1168 (11 Cir. 2005).

In reviewing a motion for summary judgment, the court is only compelled to take reasonable inferences in favor of the non-movant. See Tinker v. Beasley, 429 F.3d 1324, 1326 (11 Cir. 2005); Kesinger v. Herrington, 381 F.3d 1243, 1247 (11 Cir. 2004) ("a mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment"). The Court, however, is generally obliged to resolve disputed facts in the plaintiff non-movant's favor. "Issues of credibility and the weight afforded to certain evidence are determinations appropriately made by a finder of fact and not a court deciding summary judgment." McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1240 n. 7 (11 Cir. 2003).

Although the Court may reject fantastic or utterly implausible testimony at summary judgment, Cf. Kesinger ex rel. Kesinger v.

---

[5] "[The Court is] not to view the matter ... from the comfort and safety of [its] chambers, fearful of nothing more threatening than the occasional paper cut as [it] read[s] a cold record accounting of what turned out to be the facts. [The Court] must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction could prove fatal." Crosby v. Monroe County, 394 F.3d 1328, 1333-34 (11 Cir. 2004).

Herrington, 381 F.3d 1243, 1249 (11 Cir. 2004) (rejecting as "not substantial evidence" an eyewitness's testimony which was directly controverted by physical evidence), here, the plaintiff Jean-Baptiste's evidence and sworn statement regarding his and the defendant Officer Gutierrez's alleged conduct [i.e. that he (Jean-Baptiste) did not point a gun at Gutierrez, that Gutierrez shot without warning, causing him to fall to the ground after one or two shots, and that Gutierrez then moved closer and continued shooting until his clip was empty], is not so outrageous or implausible that no reasonable juror could believe this portion of his evidence. Although the burden of persuasion at criminal trial is different than that required in a civil matter, it is not insignificant that a jury of his peers acquitted the plaintiff (Jean-Baptiste, a/k/a Baptiste-Jean) of committing Aggravated Battery on a LEO, or lesser included offenses, against Officer Jose Gutierrez.

As discussed further below, in this Report, the defendant Gutierrez in his Motion for Summary Judgment (DE#37, at p.5, footnote 4) responds to plaintiff's allegation that he [Gutierrez] shot him, causing him to fall to the ground, and then approached and stood over him and fired 12 to 13 more times.

Clearly, there are in this case, genuine issues of material fact, the existence of which makes summary disposition of Jean-Baptiste's complaint against Gutierrez in appropriate. Celotex Corp. v. Catrett, supra. These include whether Jean-Baptiste pointed a gun at Officer Gutierrez; how many shots were fired by defendant Gutierrez [Gutierrez states that he fired 14 times, yet only 12 casings from his 9mm gun are noted in the police reports]; from what distance and at what angle the bullets were fired; how many shots were fired by Gutierrez before plaintiff Jean-Baptiste fell to the ground [plaintiff says 1-2, and defendant says 14]; which of the shots fired by Gutierrez struck Jean-Baptiste, and which caused his wounds; and what became of the fired projectiles that were not recovered at the scene.

It is here noted that, in his Summary Judgment motion,

Gutierrez argues that plaintiff's allegation that he stood over him and shot him is simply not credible, and should be rejected. Gutierrez's argument and reasoning regarding this issue/claim is, as follows:

> Plaintiff's assertion that Off Gutierrez shot Plaintiff once, and "[a]fter plaintiff fell to the ground, the defendant, Jose Gutierrez, did stand over the plaintiff...and shot plaintiff an additional twelve (12) to thirteen (13) times," Compl. at p.5, is not only contradicted by the facts, but also stretches the boundaries of rational thought by alleging that a police officer who stood directly over a wounded suspect, shot that suspect twelve to thirteen times and completely missed the upper torso of the suspect and altogether the suspect at least six (6) times. According to Plaintiff's version of the facts, the laws of physics would also indicate that those six (6) bullets that were shot from Off. Gutierrez's firearm and completely missed Plaintiff would be lodged in the ground next to or in fairly close proximity to where plaintiff lay, however, only two projectiles were found anywhere near where Plaintiff fell after being shot. *See* Melgarejo Report (Ex.14), Crime Scene Report (Ex.15); Crime Scene Drawing (Ex.20).

(DE#37, Motion, at p.5, footnote 4). Notwithstanding this logic, resolving the issue of where projectiles went after they were fired, and the other matters noted above which are in dispute, would require the Court to speculate, and make credibility determinations.

Summary judgment is not a procedure for resolving a swearing contest. Chandler v. Baird, 926 F.2d 1057 (11 Cir. 1991). In this case, resolution of the issues and facts that are in dispute, based upon the parties' opposing and conflicting evidence, would require the Court to step outside its assigned role, and invade the province of the jury. As the Supreme Court stated in its opinion in Anderson v. Liberty Lobby, Inc., supra, "Credibility determina-

tions, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to believed, and all justifiable inferences are to be drawn in his favor." Anderson, supra, 477 U.S. at 255 (citing Adickes v. S. H. Kress & Co., 398 U.S. 144, 158-59 (1970)).

This does not mean, when taking the plaintiff's version of the facts as true [i.e. that he fell to the ground after 1-2 shots] that as to that initial use of force, the defendant Gutierrez could not possibly be entitled to qualified immunity for an initial discharge of his weapon. The plaintiff has not stated in his Affidavit that he did not have a gun in his possession at the time he was shot. He has simply said that he did not point a weapon at Gutierrez, and did not have a cocked weapon. Gutierrez knew [via a BOLO] that Black males were involved in an armed home invasion, and that they fled in a red Neon. Gutierrez also knew [from personal observation] that a car matching the description of the suspect vehicle was pursued by him and crashed, that persons who presumably bailed out of the car were pointed out to him by a civilian, that they were two Black males, that one appeared to possibly be armed, that he (Gutierrez) saw one jump a fence and disappear, and that he then suddenly came upon another Black male in a back yard near the fence. If, having the aforementioned knowledge, Gutierrez perceived that the suspect he was facing was armed and posed a risk of harm, even if he did not actually see a weapon, he could be entitled to qualified immunity, at least for an initial discharge of 1-2 projectiles which plaintiff says took him to the ground. See discussion at footnote 3 and related text of this Report, regarding Carr, supra, 338 F.3d at 1269 (quoting McLenagan v. Karnes, 27 F.3d 1002 (4 Cir. 1994)). It appears, however, that a determination regarding whether under those circumstances Gutierrez would be entitled to qualified immunity for shooting Jean-Baptiste once or twice, still cannot be made based on the evidence of record. To do so at this juncture would again require speculation on the part of the Court. This is because, assuming as it must [i.e., taking non-

movant/plaintiff's version of the facts to be true] that plaintiff did not point a gun at Gutierrez, the Court cannot determine from evidence of record whether Jean-Baptiste even had a gun in his hand that Gutierrez could see. If he did not, the Court also cannot determine what is was about Jean-Baptiste's movements or demeanor, when Gutierrez encountered him by the shed, that could have caused Gutierrez to believe that he posed to him a risk of serious bodily harm or death, so as to justify use of deadly force.

Again, taking as true plaintiff's version of the facts [that Gutierrez continued shooting him after he fell to the ground], it clearly cannot be said here, at summary judgment, that the defendant officer is entitled to disposition of the complaint, in his favor, based on entitlement to qualified immunity.

## IV. CONCLUSION

It is therefore recommended that: 1) the defendant Gutierrez's Motion for Summary Judgment (DE# 37) be denied; and 2) the case remain pending on the claim that Gutierrez used excessive force, when shooting the plaintiff Jean-Baptiste during the course of his arrest on July 24, 2003.

Objections to this report may be filed with the District Judge within ten days of receipt of a copy of the report.

Dated: February 20th 2009.

_____
UNITED STATES MAGISTRATE JUDGE

cc:  Erlis Jean-Baptiste, Pro Se
     a/k/a Erlis Baptiste-Jean
     DC# 192393
     Dade Correctional Institution
     19000 S.W. 377th Street
     Florida City, FL 33034-6499

Michael Brian Nadler, Esquire
Wilfredo Antonio Ferrer, Esquire
Miami-Dade County Attorney's Office
111 N.W. 1st Street, Suite 2810
Miami, FL 33128-1993


The Honorable Alan S. Gold,
United States District Judge