```
                                   UNITED STATES DISTRICT COURT
                                   SOUTHERN DISTRICT OF FLORIDA

                                   CASE NO. 07-21728-Civ-GOLD
                                   MAGISTRATE P. A. WHITE
ERLIS JEAN-BAPTISTE,            :

        Plaintiff,              :

v.                              :      SUPPLEMENTAL REPORT
                                       OF MAGISTRATE JUDGE
JOSE GUTIERREZ,                 :

        Defendant.              :
_____
```

This Cause is before the Court upon an Order of Reference (DE# 85) by the Honorable Alan S. Gold, United States District Judge, requesting a Supplemental Report and Recommendation, after the filing of Objections by the Defendant Rodriguez (DE#79) in opposition to a Report (DE#65) which recommended the denial of defendant Rodriguez's motion for summary judgment (DE#37).

Plaintiff alleges that Gutierrez, a Miami-Dade Police Officer, used excessive force by shooting him when making his arrest. Gutierrez moved for summary judgment, arguing that under the circumstances of the case he was entitled to use deadly force to effect the plaintiff's arrest, that there is no genuine issue as to any material fact, and that he is entitled to qualified immunity.

As summarized in the Order of Reference for a Supplemental Report, defendant Rodriguez argues in his Objections that factual disputes cited in the Report DE#37, including whether plaintiff pointed the gun at Officer Rodriguez, and whether Rodriguez warned plaintiff to drop the gun, are not material to the determination whether a constitutional violation occurred. Rodriguez also argues that once he was authorized to use deadly force, it was immaterial whether he shot plaintiff twice (until plaintiff allegedly fell to the ground), or whether he shot the plaintiff fourteen times. Defendant Rodriguez further argues that the Report (DE#37) failed to address whether there was clearly established law putting him on notice of constitutional violation given the facts of this case.

Although plaintiff alleged he was shot on July 23, 2003 (Complaint DE#1), the record shows the events occurred on July 24.

The defendant and plaintiff offer differing versions of the facts. In brief, defendant police officer Gutierrez states that he engaged in a vehicular pursuit, and then a foot chase with suspects, who based on a BOLO were believed to have been involved in an armed home invasion. Gutierrez claims that he suddenly came upon plaintiff Jean-Baptiste in a back yard near a shed, waiting "in ambush" for him, with a gun raised and pointed directly at him. Gutierrez claims he feared for his life, and immediately started shooting his police weapon, without prior warning to the plaintiff that he would use deadly force, because delay could have resulted in his death. Gutierrez asserts that he discharged all rounds from his weapon in rapid succession, and that only after the last shot was fired did the plaintiff fall to the ground. The plaintiff has sworn to a different set of facts, stating he never pointed a gun at officer Gutierrez, or threatened him in any way. He states that Officer Gutierrez without a warning [which plaintiff contends would have given him a chance to comply with orders and avoid being shot multiple times] shot him once or twice, seriously wounding him and thereby bringing him to the ground, and then proceeded to stand over him from a distance of 8 to 10 feet and continued shooting until his weapon was empty, wounding him several more times. [Plaintiff supports his claim that he made no threat toward Officer Gutierrez with a weapon at him or otherwise, by referencing his acquittal at trial on all charges of assault on the defendant Officer, and dismissal of weapons possession charges, stemming from the events underlying this case].

It is here noted, for purposes of correcting the record, that the prior Report (DE#65, at p.15) incorrectly interpreted plain-tiff Jean-Baptiste's Affidavit (DE#49, pp. 30-31) as indicating that Officer Gutierrez had <u>moved closer</u> after discharging the first two shots [which plaintiff says immediately brought him to the ground], and then continued shooting at the plaintiff from a distance of 8-10 feet away while he lay there injured. Jean-Baptiste's Affidavit states that Gutierrez rounded the corner of the shed, encountered him standing there, and opened fire which brought him to the ground immediately after one or two shots, and

that Gutierrez then, from a distance of about 8 to 10 feet from where he lay, stood over him and continued to shoot. Examination of corresponding allegations in Plaintiff's Response (DE#49 at p.18), which echo the statements in his Affidavit, clearly indicates that Jean-Baptiste in his Response alleges that the initial 1 or 2 shots were discharged from about 8 to 10 feet away, and that after he fell to the ground, the remaining shots were also discharged as Gutierrez stood over him, also from about 8 to 10 feet away.

Qualified immunity, under appropriate circumstances, serves to insulate governmental officials from personal liability for actions taken pursuant to their discretionary authority, if their conduct does not violate clearly established statutory and constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800 (1982); Vinyard v. Wilson, 311 F.3d 1340, 1346 (11 Cir. 2002). See also Lee v. Ferraro, 284 F.3d 1188, 1195 (11 Cir. 2002); Flores v. Satz, 137 F.3d 1275 (11 Cir. 1998); Foy v. Holston, 94 F.3d 1528 (11 Cir. 1996).

When engaging in an analysis at the summary judgment stage, as to whether a defendant may be entitled to qualified immunity, the court must take the facts in the light most favorable to the party asserting the injury. Saucier v. Katz, 533 U.S. 194, 201 (2001); Robinson v. Arrugeta, 415 F.3d 1252, 1257 (11 Cir. 2005); Pace v. Capbianco, 283 F.3d 1275, 1285 (11 Cir. 2002).

Once the qualified immunity defense is raised by a government official and that defendant has first shown that he was acting within his discretionary authority, Cottone v. Jenne, 326 F.3d 1352, 1357 (11 Cir. 2003), the burden shifts to the plaintiff to show that qualified immunity is not appropriate. Cottone, supra, at 1358; Foy, supra, at 1532.  In this case, it is undisputed that the defendant Gutierrez was acting under his discretionary authority as a Miami-Dade police officer. The inquiry therefore continues, with the burden on the plaintiff.

The two part test which ensues requires that, first, the court

3

must determine whether the plaintiff's allegations, if true, establish that the defendant violated a constitutional right. If he did not, then the Court's inquiry ends, and the defendant is entitled to qualified immunity. Saucier, supra, 533 U.S. at 201; Vinyard, supra, 311 F.3d at 1346. Second, if under the plaintiff's version of the facts, a constitutional deprivation did occur, the next step is to determine whether the right was clearly established at the time of the alleged deprivation. Vinyard, supra. As stated by the Supreme Court, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Saucier at 202 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). The Court must determine "whether the state of the law...gave [the defendant] fair warning that [his action] was unconstitutional." Hope v. Pelzer, 536 U.S. 730, 741 (2002). The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. Graham v. Connor, 490 U.S. 386, 394 (1989); Terry v. Ohio, 392 U.S. 1, 20-22 (1968); Vinyard, supra, 311 F.3d at 1347.

The Court of Appeals for the Eleventh Circuit has provided that there are three ways to show that the law was "clearly established," i.e., that the defendant had "fair warning" that his action(s) would violate a constitutional right.

One way is to show "that the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of [case law]." Lee v. Ferraro, 284 F.3d 1188, 1199 (11 Cir. 2002)(quoting Priester v. City of Riviera Beach, 208 F.3d 919, 926 (11 Cir. 2000)). In such a case, the law is clearly established only if the standards set forth by the Supreme Court and appropriate case law "inevitably lead every reasonable officer in [the defendant's] position to conclude the force was unlawful." Id. (quoting Priester, 208 F.3d at 927). These cases are sometimes referred to as "obvious clarity" cases, where the subject behavior "is far beyond the hazy border between

excessive and acceptable force." Vinyard, supra, 311 F.3d at 1350, n.18. Examples of such cases are Priester supra (case in which officer released police dog to attack plaintiff who was lying on the ground, did not pose a threat to officers or to anyone else, and was not attempting to flee or resist arrest); and Slicker v. Jackson, 215 F.3d 1225, 1233 (11 Cir. 2000) (case in which officers beat Slicker even though he was handcuffed and did not resist, attempt to flee, or struggle with the officers in any way").

A second way, if the conduct is not so bad that it violates a constitutional provision on its face, is to "show that a broader, clearly established principle" gleaned from the Constitution, statutes or case law "should control the novel facts in this situation." Mercado v. City of Orlando, 407 F.3d 1152, 1159 (11 Cir. 2005) (citing Hope v. Pelzer, 536 U.S. 730, 741 (2002)).

A third way, if no broad case law is applicable, is to point to a "materially similar case." Lee v. Ferraro, 284 F.3d 188, 1198 (11 Cir. 2002). "Any case law that is 'materially similar' to the facts in the case at hand must pre-date the officer's alleged improper conduct and 'truly compel the conclusion that the plaintiff had a right under federal law.'" Mercado, supra, 407 F.3d at 1159 (quoting Ensley v. Soper, 142 F.3d 1402, 1406 (11 Cir. 1998). The Court of Appeals for the Eleventh Circuit has held that in this Circuit the law can be "clearly established" for qualified immunity purposes, "only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." Jenkins v. Talladega City Bd. of Education, 115 F.3d 821, 826-27 n. 4 (11 Cir. 1997) (en banc).

In Tennessee v. Garner, 471 U.S. 1, 11 (1985), the Supreme Court held, with respect to deadly force, that it is unreasonable for an officer to "seize an unarmed, undangerous suspect by shooting him dead...". The Garner Court, however, also held that "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent

5

escape by using deadly force. Garner, supra, at 11. The Supreme Court concluded, therefore, that "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." Garner, supra, at 11-12.

While a jury, accepting defendant Gutierrez's version of the facts, could find that the use of deadly force, firing in rapid succession all of his bullets, was necessary to protect himself (and possibly the public or officers not on the scene), the Court is required to conduct its qualified immunity analysis at summary judgment by viewing all the evidence in the light most favorable to the plaintiff. (As noted in the prior Report, Gutierrez indicated in his July 2003 sworn police statement that he had heard a BOLO concerning home invasion robbery, by two armed Black males, in a red Plymonth Neon. He spotted a car matching the description, and followed it until it crashed. Two Black males, one holding an object which he [Gutierrez] presumed was a gun, bailed out and ran. Gutierrez pursued them on foot until one jumped a fence and ran Northbound, but he lost sight of the other man. As Gutierrez approached the fence he saw a shed to his left, and when he got to the corner of the shed structure he saw the second Black male, standing and holding a gun pointed directly at him. Gutierrez stated that he feared for his life, and immediately started shooting his weapon until the magazine was emptied. After he ceased firing, the suspect fell to the ground. Gutierrez said in his July 2003 Police Statement that he saw that the suspect was in one place and that the firearm was to the side of him, so he went to the other side of the shed and reloaded his weapon. At deposition, three years later, in 2006, Gutierrez testified that when he "cleared the shed" he saw the suspect "standing there with his gun pointed at me." When asked if he had seen the gun before, Gutierrez said that it was "a blunt object in the hand" and that because the BOLO was about a home invasion robbery by two men with guns, driving a red Neon, instinct had told him it was a gun. Gutierrez

6

testified that he did not ask the man to drop the gun, or give warning that he was going to use deadly force, because if he had waited to do so he [Gutierrez] would have been dead. He testified that "I cleared my entire magazine, which was 14 rounds," discharging them "one right after the other," and testified that it was only after the very last shot that "the subject finally went down." At deposition in 2006, when Gutierrez was asked what happened then, he said that after he approached he saw the subject, and saw the firearm that was lying next to him. He wanted to make sure there was no threat on the other side, and went ahead and dropped his magazine, and reloaded his gun).

The plaintiff Jean-Baptiste's version of the facts stands in stark contrast to that of officer Gutierrez. Plaintiff states in his sworn affidavit that at no time did he point a firearm at Gutierrez, or otherwise threaten him by word or action. Plaintiff states that he was standing by the shed when Gutierrez encountered him, and Gutierrez, without any warning, opened fire. Plaintiff states that because no warning was given he had no opportunity to avoid being shot. Plaintiff states that Officer Gutierrez shot once or twice, striking him in the testicles, and that this brought him immediately to the ground. Plaintiff Jean-Baptiste swears that after the first one or two shots had already brought him to the ground, Gutierrez then stood over him and continued shooting, from a distance of about 8 to 10 feet, and did not stop until there were no bullets left in his gun. A Police Investigation Report and Crime Scene and Laboratory Reports indicate that two guns were found. One was on the ground in the front yard of a neighboring house, the other was found at the main scene of plaintiff's arrest, lying in the grass just to the East of a pile of clothing that had been cut off of the plaintiff by paramedics who responded to the scene to attend to his wounds. The pants had a black cloth clip-on gun holster inside the waistband. (As noted in the prior Report, the gun found on the ground East of the clothing was half cocked, with the safety off, the chamber empty, and 12 rounds in the magazine). Plaintiff's clothes had holes corresponding to wounds described by physicians. Plaintiff, when examined at the hospital, appeared to

7

have 8 gunshot wounds, one to the testicles, one to the foot, and 6 others in left and right legs. There were 12 shell casings in the grass from Gutierrez's weapon; but only 2 projectiles, and the fragment of another, were found at the scene.

Apart from that of Jean-Baptiste and Gutierrerz, there was testimony from an eye witness to the shooting, Ernesto Perez. Perez, an air conditioning technician, watched from the roof of a 5 story building as the events unfolded. He saw the car crash, saw men bail out and run, and saw the shooting of Jean-Baptiste (stating he "heard the shot fired and the guy fall").

In his sworn affidavit, plaintiff Jean-Baptiste states that he did not have a cocked firearm, and that if a cocked gun was found at the scene it was cocked by someone other that him.

The shooting of Jean-Baptiste took place during daylight hours, at about 11:15 a.m. Thus, it does not appear that this is a case in which lack of illumination could contribute to confusion or mistake regarding whether a gun was being pointed at an officer.

Under the facts alleged by Jean-Baptiste, it appears that a reasonable jury could find that it was feasible for Officer Gutierrez to provide him a warning before commencing use of deadly force. Similarly, it is apparent that a reasonable jury could find that the use of force applied by Officer Gutierrez was unreasonable, where plaintiff's evidence indicates that he was not in possession of a cocked weapon, and was not pointing a firearm at the defendant Officer Gutierrez when he (Gutierrez) suddenly opened fire from a distance of 8 to 10 feet, and shot the plaintiff in the testicles, immediately bringing him to the ground, and then, after the initial discharge(s) of his weapon, stood over the plaintiff who was already wounded and lying on the ground, and continued shooting him from about 8-10 feet away until he discharged another 12 rounds and his weapon was empty, wounding the plaintiff 6 or 7 more times after he was already on the ground.

8

As such, under the first prong of the <u>Saucier</u> analysis, the plaintiff Jean-Baptiste has alleged facts that could support a jury finding that there was a violation of his Fourth Amendment rights.

The Court thus must turn to the second step of the <u>Saucier</u> analysis which is a determination whether the law was clearly established so as to put Gutierrez on notice that his actions would constitute a deprivation of the plaintiff Jean-Baptiste's constitutional rights. The question is whether the officer "reasonably could have believed that probable cause existed to use deadly force." <u>See</u> <u>Montoute v. Carr</u>, 114 F.3d 181, 184 (11 Cir. 1997). The inquiry for analysis of the officer's qualified immunity defense focuses on "whether the officer's actions are objectively reasonable in light of the facts confronting the officer, regardless of the officer's underlying intent or motivation." <u>Id.</u>, at 183.

For purposes of analysis regarding the question of clearly settled law, this case does not appear to fit into the first category mentioned above, i.e., behavior so obviously lying outside the core of what the Fourth Amendment permits, that notice via prior case law is not necessary. In such cases, there is generally undisputed evidence that force was applied when an individual (inmate or suspect) was not posing a threat to officers or trying to flee, or when the individual who had been resisting or fleeing had ceased that behavior, or was restrained, and use of force against him/her still continued. As noted <u>supra</u>, examples of such behavior were found in <u>Priester</u> and <u>Slicker</u>, <u>supra</u>. (In <u>Brosseau v. Haugen</u>, 543 U.S. 194, 199 (2004), a case involving the shooting of a suspect while he was fleeing in a vehicle in a potentially dangerous manner, the Supreme Court noted that such cases which are "obvious" under constitutional standards are atypical).

At the time of plaintiff Jean-Baptiste's arrest, however, there existed relevant precedent, binding in this Circuit, which falls into the second category of cases, involving broader clearly established principles. <u>See</u> <u>Skrtich v. Thornton</u>, 280 F.3d 1295, 1304-1305, n.9 (11 Cir. 2002) (citing <u>Whitley v. Albers</u>, 475 U.S.

9

312, 320-21 (1986), and Hudson v. McMillian, 503 U.S. 1, 7-8 (1992)). The factual scenario in Skrtich involved the use of force by guards in an institutional setting, and not the shooting of a suspect by a police officer; but the holdings by the Eleventh Circuit in Skrtich, which stand for broad principles that force must be proportionate to need at the time it is applied, and must cease once the need for use of force no longer exists, are applicable to this case. The Eleventh Circuit in Skrtich cited Whitley for its holding that force being used against a prisoner must cease once the prisoner complies with an order and ceases resistance, or is incapacitated (i.e., that the use of force must stop when the need for it to maintain or restore discipline no longer exists). Skrtich, supra, 280 F.3d at 1304. The Court in Skrtich held that this principle from Whitley applies "whether the prisoner is in a cell, a prison yard, police car, in handcuffs on the side of the road, or in any other custodial setting." Skrtich, at 1304. Continuing, the Skrtich Court stated "[i]ndeed, our excessive force analysis has never turned on the physical location of the victim of a government official's application of excessive force," Skrtich, supra at 1304, n.9., and stated that "[t]he focus has always been on the material factors, i.e., 'the need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response.'" Skrtich, supra, 280 F.3d at 1304-05, n.9 (quoting Hudson, supra, 503 U.S. at 7-8)).

In addition to the holdings of Garner, and the general principles established by Skrtich, Whitley, and Hudson, computer assisted research reveals several police shooting cases from the Eleventh Circuit, falling into the third category, i.e. cases materially similar to the case at bar. The first of those cases, Lundgren v. McDaniel, 814 F.2d 600, 603 (11 Cir. 1987) was decided 16 years before Jean-Baptiste's July 24, 2003 shooting, which is the subject of this lawsuit. A second case, Samples v. City of Atlanta, 846 F.2d 1328 (11 Cir. 1988) came some 15 years before Jean-Baptiste's 2003 arrest. A third case, Carr v. Tatangelo, 338 F.3d 1259 (11

Cir. 2003), was decided on July 23, 2003, one day before Jean-Baptiste's July 24 shooting, and was released as an amended opinion 68 days later on September 29, 2003. A Fourth case, Caruthers v. McCawley, No. 08-16538, 2009 WL 2392904, at *1-2 (11 Cir. Aug. 6, 2009), is instructive, but not binding for purposes of the qualified immunity analysis in this case, because it post-dates Jean-Baptiste's arrest by 6 years.[1]

In Lundgren, the events occurred at a video store. On July 10, 1983, the front store window was broken. The proprietor and his wife decided to sleep inside that night. Two officers on patrol

---

[1] In the case of Caruthers v. McCawley, decided in 2009, the Eleventh Circuit affirmed the District Court's ruling that the defendant Sheriff's Deputy McCauley was not, as a matter of law, entitled to qualified immunity because, viewing the facts in the light most favorable to Caruthers, against whom deadly force had been used in apprehending him, a reasonable jury could find that McCawley violated Caruthers' clearly established constitutional right to be free from excessive force. The events in the case unfolded after Caruthers, who was wanted for several bank robberies, including one earlier on the day of his arrest during which he had threatened to kill a teller. Caruthers was found with a woman named Gibbons in a motel by local law enforcement officers, and an Emergency Response Team ("ERT") responded. The ERT officers, including McCawley, took position outside the room after negotiations had begun. Police believed that Gibbons was a hostage, because they could see through a window that Caruthers was blocking her from leaving, and they could hear the two arguing. After two hours of negotiations between Caruthers and police, the ERT officers learned that Gibbons was going to leave the room. When the door opened, however, Caruthers came out. It is after that point that the parties' versions of the facts were in dispute. Caruthers claimed that he shouted he was surrendering and coming out, and exited the room with his hands in a "surrender position," holding a white towel in accordance with earlier police instructions. Caruthers stated that when he saw no officers directly in front of him he turned to his right and saw the ERT team kneeling behind a shield, and then heard officers yelling to raise his hands higher and get on the ground. He claimed that when attempting to raise his hands higher he was shot in the chest by McCauley, and that he then turned the other way and ran, at which time McCauley shot him three more times, striking him in the spine. While he was fleeing, another officer also shot him using a shotgun load of non-lethal "bean bags." He fell to the ground, and a third officer shot him with a Taser. Caruthers, supra, at *2. Officer McCauley's version of the facts was that Caruthers was not holding his hands in a surrender position, and that he appeared instead to be holding a "dark object" when he exited from the room, looked both ways, and suddenly turned and spun his body toward McCawley. Four other officers stated in post-incident investigations that they saw Caurthers holding a towel, and did not see a weapon. The Eleventh Circuit, noting that Caruther's sworn complaint, and the post-incident interviews clearly established a genuine issue of material fact regarding whether a reasonable officer would have believed that Cauthers was armed and deadly force was justified. The Appellate Court therefore affirmed the district court's judgment, noting that the district court did not err in denying summary judgment based on qualified immunity grounds. Caruthers, supra, at *3.

noticed the broken window. Suspecting that a burglary was in progress, they entered the store at about 2:00 a.m., unannounced. Officer Davis testified that he saw a large shadow or silhouette rise from behind a desk and saw a flash of light from a gun, and felt a blast of hot air on his forehead. Davis testified that after being shot at he returned fire, discharging his weapon three times. When the shooting stopped, Officer Davis testified that he saw a man [the shop owner, Richard Lundgren] lying on the floor, with blood trickling from his head, and saw a gun lying on the floor. The defendant Officer testified that the woman [Margaret Lundgren, the proprietor's wife] then reached for the gun, and he told her not to touch it. Although Davis testified at trial that Mrs. Lundgren had fired the first shot, he had told an investigator in a prior statement that Mr. Lundgren had fired the first shot. Officer Cloud, Davis' partner, testified at trial that he saw a man stand up from behind a desk with a pistol in both hands. Fearing that he would be shot, he closed his eyes and wheeled backwards, and while he was doing so he heard the first shot being fired. It sounded to Cloud like it came from behind the desk, but [because his eyes were closed] he did not know whether Mr. or Mrs. Lundgren had fired it. In a prior statement, however, Cloud said that Mr. Lundgren had fired the first shot with a gun that was found inside the video store. At trial, Mrs. Lundgren testified that she woke up her husband when she heard someone walking on the broken glass outside the store, and that as her husband was raising up someone started shooting and he [Mr. Lundgren] was shot. She testified that her husband was not all the way above the desk when he was shot and struck, and that her husband never fired a shot. She also denied having reached for a gun. On cross examination, Mrs. Lundgren testified that she never saw her husband reach for a gun. When confronted with her prior deposition statement in which she said "I recall him reaching for his gun," she retracted her statement, and said that she did not know whether her husband reached for a gun, and that he could have fired a shot. She also testified, that he never really had a chance to get up off the floor. Forensic examination revealed that Mr. Lundgren was struck in the right temple by one bullet, that first passed through the

desk. Investigators found no evidence suggesting that either Mr. or Mrs. Lundgren fired a shot. The pistol found at the store had lint inside the barrel, no ejected shell casings from that gun were found, and no gunshot residue was present on Mr. Lundgren's hands.

As noted by the Eleventh Circuit, in Lundgren, supra, 814 F.2d at 602-603, the Supreme Court in Tennessee v. Garner, "has indicated that 'if the suspect threatens the officer with a weapon...deadly force may be used,'" and therefore if the facts were as the appellants claim, then the deputies' conduct would violate no constitutional rights. Lundren, supra, at 602. The Court, however, finding that the facts were in dispute, and were sharply contested by the parities, determined that a jury could reasonably have believed that the officers were neither threatened by a weapon, nor were fired upon, but rather that the officers without provocation had shot an undangerous suspect. Id., at 602-03 The Court announced its conclusion, stating: "We hold that shooting a suspected felon who was apparently neither fleeing nor threatening the officers or others was -- even in July, 1983 -- an unreasonable seizure and clearly violated fourth amendment law." Lundgren, 814 F.2d at 603.

In Samples, the officer [Oglesby] and suspect [Samples] were the only persons present at the shooting, and there were no other witnesses to the incident. Because Samples was deceased, the only available account came from Officer Oglesby himself. In this case, the officer [defendant Gutierrez] and the suspect who was shot [plaintiff Jean-Baptiste] also were the only persons present at the scene of the shooting; but there was another eye witness [the air conditioning technician Perez whose testimony is consistent with plaintiff Jean-Baptiste's version of the facts, that after the first shot or two he fell to the ground].

In Samples, the Eleventh Circuit found that summary judgment for defendant Officer Ogelsby was inappropriate because the evidence was not uncontroverted, as the defendants alleged. Although there was evidence from which a fact finder could conclude that

13

Oglesby's actions were reasonable, there also was evidence suggesting the contrary conclusion. Oglesby testified that he was driving in a high crime area, and saw Samples screaming like a demented person in a phone booth. He radioed his intent to investigate, and exited his police car to question Samples. Samples responded by throwing a Fanta grape soda bottle at Oglesby. Oglesby also said that Samples pulled a knife from his pocket and began opening it, and while doing so approached him in a threatening manner. Oglesby told Samples to stop opening the knife, but instead of listening he moved even closer. Oglesby then shot Samples. Oglesby explained that he did so because he feared for his life. The first shot did not stop Samples, and only seemed to increase his anger and efforts to approach and harm Oglesby. Oglesby stated that he then continued to shoot, until Samples turned around, took a few steps, and fell to the ground. Information that was available, which supported Oglesby's version of the facts, included that Samples was on the phone talking to his mother around the time of the shooting; that he was admittedly in a confused and emotional state; that he had almost gotten into a fight earlier in the evening; that there was a broken Fanta bottle at the scene, and that a knife lay on the ground not far from Samples' dead body. There also were facts which raised contrary inferences. The knife that lay near Samples was unopened, although it was of the type that automatically closes if the blade is not opened beyond a 40 degree angle. The court noted that it was possible that Samples started to open the knife but was shot before he could do so, and the blade automatically closed. It was also possible, however, that Samples never attempted to open the knife, which the Court noted would "if true,...raise a serious issue regarding the question of excessive force." The Court noted that there was additional physical evidence from which a fact finder could infer that -- even based on Oglesby's version of the facts -- Oglesby was excessively violent. The knife itself was one such piece of evidence, because it was a small one, with a three inch blade. The Court noted that a jury could conclude that Oglesby applied excessive force in reacting as he did to a small, at least partially-unopened pocket knife. The Court also noted that one of the bullets struck Samples in the back. This raised a serious issue

of fact. While it was possible that the force of the first four bullets spun Samples around, so that the fifth struck him in the back, it is also possible that Samples turned to run away, and that Oglesby continued shooting. The Court noted, however, that another possibility was that the first shot hit Samples in the back, and that this so angered him that he turned and started running at Oglesby. The Court noted that in either scenario serious issues of fact existed regarding the question of excessive force, and therefore summary judgment was inappropriate.

In Carr v. Tatangelo, 338 F.3d 1259 (11 Cir. 2003), decided the day before Jean-Baptiste's July 24, 2003 shooting in this case, the Eleventh Circuit held that Officer Fortson who shot appellant Carr with intent to kill him, was entitled to qualified immunity, where evidence established that Fortson who had drawn his weapon, did not fire his gun until he saw Carr point what he believed to be a gun at Officer Tatangelo who was hiding in some bushes, and Fortson heard a distinctive sound that he believed to be the chambering of a bullet. Tatangelo also heard the sound of a bullet being chambered. The Court, in Carr, noted that under the Supreme Court's opinion in Garner it was constitutionally permissible to use deadly force when the officer had probable cause to believe that the suspect posed a threat of serious physical harm, either to the officer or to others, and determined that Fortson, as well as fellow officers, were entitled to qualified immunity.

It does not appear that Carr is dispositive of plaintiff Jean-Baptiste's claims, because in this case there is a serious dispute between defendant Gutierrez's and plaintiff Jean-Baptiste's evidence, regarding whether plaintiff pointed a gun at Gutierrez and thereby allegedly put him in fear for his life.

As discussed above in this Report, and in the earlier report in this case, two weapons possession charges brought against Jean-Baptiste were dismissed [Unlawful Possession of a Firearm by a Convicted Felon; and Unlawful Possession of a Firearm by a Violent Career Criminal]. In addition, when Jean-Baptiste was tried to a

jury he was acquitted of all charges related to use of a firearm during his encounter with Officer Gutierrez [the charge of Aggravated Assault on a Law Enforcement Officer, was based on pointing a firearm at Gutierrez and thereby creating in him a well-founded fear that violence was imminent]. Jean-Baptiste was also acquitted of the lesser included offenses [aggravated assault, assault on a LEO, and simple assault].

Here, where the plaintiff's and defendant's sworn versions of the material facts are conflicting, it is apparent that summary judgment based on qualified immunity is not appropriate.

The fact that plaintiff Jean-Baptiste was acquitted of all assault charges against Officer Gutierrez creates a serious question regarding Gutierrez's claim that when he encountered Jean-Baptiste by the shed in a back yard Jean-Baptiste was pointing a handgun directly at him, and that instead of giving a warning that he would use deadly force, he immediately commenced firing his police weapon, discharging it without stopping until all his bullets were expended, because he feared that Jean-Baptiste was at that moment about to shoot and kill him.

As discussed in the prior Report, and this one, there also is conflicting evidence regarding whether Gutierrez continuously shot his weapon, emptying the clip without stopping, finally bringing the plaintiff to the ground only after the 12th or 14th round had been discharged; or whether he shot the plaintiff, bringing him to the ground with a shot to the testicles after only one or two rounds, and then continued firing an additional 10 or 12 times, standing over the plaintiff from about 8-10 feet away, after he was already wounded and on the ground, and while doing so struck plaintiff with projectiles approximately 6 or 7 more times.

If it were the defendant's version of the facts that must be taken as true at summary judgment for purposes of determining qualified immunity, then under the applicable law, it is apparent that the Gutierrez would be entitled to qualified immunity. Under

that scenario, an officer was faced with an immediately life threatening situation, and having no time to react because a suspect he had been pursuing on foot was pointing a gun at him and presumably was about to kill him, he discharged his weapon in a matter of seconds, expending all his bullets to save his own life. See Tennessee v. Garner, supra, at 11-12; Carr v. Tatangelo, supra.

Here, however, for purposes of determining qualified immunity at summary judgment, the court must take the evidence of record and construe it in the light most favorable to the plaintiff.

Even accepting the evidence that Officer Gutierrez responded to a BOLO indicating that suspects fleeing from a burglary scene were believed to be armed, and encountered and pursued the suspects who were fleeing in a car of the description given in the BOLO, and then engaged in foot pursuit, it appears under existing precedent at the time of plaintiff's arrest, if the plaintiff's version of the facts is taken as true, that a jury could find that it was unreasonable for Gutierrez to engage in use of deadly force (i.e. shooting to kill) when he encountered Jean-Baptiste in the back yard of a house, near a shed. (According to Jean-Baptiste, he was simply standing there without a cocked weapon, and was not pointing a gun at Gutierrez or in any other way threatening Gutierrez so as to put him in fear for his life). Although evidence of record indicates that plaintiff had previously been fleeing by car and on foot from officers including Gutierrez, the evidence does not indicate that once Gutierrez found him in the yard by the shed, and had him covered with his police issued weapon, that Jean-Baptiste turned or made any further effort to flee. Under the facts, taken in the light most favorable to the plaintiff Jean-Baptiste, a jury could reasonably believe that he was at that point in time a suspect, who was not actively threatening or confronting the officer with weapon, and was no longer attempting to run from the officer who had drawn his service weapon and was pointing it at him.

Under Garner, and under Circuit precedent (see Lundgren supra, a case where officers entered a premises in which they believed a

17

break-in was ongoing, but due to conflicting evidence it was not clear that a weapon found at the scene was wielded against officers before a policeman shot and killed the shop owner who was mistaken for an intruder) it appears, where facts are in dispute about whether police were threatened with the display of a weapon, and that alleged display (or use) of the weapon is the basis for an officer's contention that his use of deadly force was justified, there is a genuine issue of material fact which should preclude a determination on summary judgment that the defendant is entitled to qualified immunity.

Insofar as there is evidence that a non-police handgun was found at the scene, near a pile of clothing stripped from the wounded plaintiff Jean-Baptiste by paramedics, which included plaintiff's pants with a holster inside the waistband, that evidence, taken in the light most favorable to the plaintiff [and considered in conjunction with plaintiff's sworn statements that he did not point a gun at Gutierrez, that he did not possess a cocked gun, and that if a cocked gun was found at the scene someone else cocked it], could be interpreted by a reasonable jury in more than one way. One interpretation could be that plaintiff in fact had no weapon [though he never comes out and directly denies possessing a firearm, but rather only denies possessing a cocked weapon, and denies pointing a weapon at officer Gutierrez]. The evidence could also be interpreted to indicate that plaintiff had a weapon on his person, but that it was not drawn, and instead was tucked in the holster inside his pants at the time Gutierrez encountered him, and was never displayed by plaintiff so as to put Officer Gutierrez in fear of harm as charged in the Information.

Under <u>Garner</u>, <u>Samples</u>, and <u>Skrtich</u>, it appears, where the evidence does not indicate that plaintiff Jean-Baptiste turned to run when confronted by officer Gutierrez who had his service pistol drawn and pointed him, and where there exist genuine issues of material fact regarding whether the plaintiff threatened Gutierrez with a gun as the officer alleges, a jury could conclude that the use of force was excessive; and therefore the defendant officer

should not be entitled to summary judgment based on qualified immunity for opening fire on Jean-Baptiste without warning.

It would follow, under Garner, Samples, and Skrtich, [taking the evidence in the light most favorable to the plaintiff] that a jury could conclude that shooting at and wounding the plaintiff an additional 6 to 7 times after the first two shots had already taken him to the ground was an excessive use of force, where that evidence would suggest that the plaintiff [who presumably was not threatening officer Gutierrez with a weapon] was at that time on the ground, incapacitated and not attempting to or able to flee; and therefore the defendant officer should not be entitled to summary judgment based on qualified immunity for the alleged continued use of force after plaintiff was already shot, and lying injured on the ground. (It is noted that the defendant has argued that it is immaterial whether he shot the plaintiff twice, or 14 times, because once he was justified in shooting the plaintiff at all, he was justified to continue application of such force until the plaintiff was dead). It appears, under the facts of this case taken in the light most favorable to the plaintiff, that applying and accepting that argument here would ignore precedent (Garner and Skrtich) holding that when an individual is not posing a threat to an officer and trying to flee, deadly force is inappropriate, or that when an individual initially resisted but was longer posing a threat, the use of force should cease.

In sum, in this case the parties' versions of the facts are at odds, there are issues of material fact in dispute which impact on the questions of the nature of the threat that plaintiff Jean-Baptiste posed to the defendant Officer Gutierrez, and regarding the nature and extent of force that was appropriate under the circumstances. The resolution of those questions should be left to a jury; and if the defendant Officer Gutierrez is entitled to qualified immunity, that determination should be made at trial. Chandler v. Baird, 926 F.2d 1057 (11 Cir. 1991); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

19

It is therefore recommended that: 1) the defendant Gutierrez's Motion for Summary Judgment (DE#37) be denied; and 2) the case remain pending on the claim that Gutierrez used excessive force, when shooting the plaintiff Jean-Baptiste during the course of his arrest on July 24, 2003.

Objections to this report may be filed with the District Judge within ten days of receipt of a copy of the report.

Dated: October 28th , 2009.

_____
UNITED STATES MAGISTRATE JUDGE

cc:  Erlis Jean-Baptiste, <u>Pro Se</u>
     a/k/a Erlis Baptiste-Jean
     DC# 192393
     Columbia Correctional Institution
     216 S.E. Corrections Way
     Lake City, FL 32025-2013

     Michael Brian Nadler, Esquire
     Wilfredo Antonio Ferrer, Esquire
     Miami-Dade County Attorney's Office
     111 N.W. 1st Street, Suite 2810
     Miami, FL 33128-1993

     The Honorable Alan S. Gold,
          United States District Judge